IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BRIDGET ROBERTS                                                    PLAINTIFF

v.                            Case No. 4:20-cv-01326-LPR

PVH CORP.                                                          DEFENDANT

## ORDER

This case arises from Defendant PVH Corp.'s demotion of Plaintiff Bridget Roberts. Ms. Roberts alleges that this demotion amounted to retaliation in violation of the Age Discrimination in Employment Act of 1967 (ADEA).[1]  More specifically, she says the demotion was retaliation for an age discrimination EEOC Charge she filed.  PVH disagrees.  PVH says the EEOC Charge had nothing to do with the demotion.  According to PVH, Ms. Roberts was demoted because of a pattern of performance issues and a lack of improvement after feedback and retraining.  Pending before the Court is Defendant's Motion for Summary Judgment.[2]  For the reasons stated below, the Court GRANTS the Motion for Summary Judgment.

## BACKGROUND[3]

On October 23, 2017, PVH hired Ms. Roberts as a part-time sales associate at PVH's Tommy Hilfiger store in Little Rock.[4]  She was 40 years old at the time.[5]  About a year later—on

---

[1] Pl.'s Compl. (Doc. 1) at 5.

[2] Def.'s Mot. for Summ. J. (Doc. 35).

[3] Where a defendant moves for summary judgment, the Court relies on (1) undisputed facts and (2) genuinely disputed facts construed in the light most favorable to the plaintiff.  Essentially, the Court considers the most pro-plaintiff version of the record that a reasonable juror could conclude occurred.  The Court's factual recitation is therefore only good for the summary judgment motion.

[4] *See* Pl.'s Am. Statement of Disputed Material Facts (Doc. 45) at 1–2.  Although titled "Plaintiff's Amended Statement of Disputed Material Facts," this document (Doc. 45) is actually Plaintiff's Amended Response to Defendant's Statement of Undisputed Material Facts (Doc. 37).

[5] Pl.'s Dep. (Doc. 36-1) at 9.  When citing to the record, this Order cites to the page numbers set forth in the ECF filing stamp (at the top of each page).

October 9, 2018—Ms. Roberts made an initial contact with the EEOC.[6]  She believed that, during her year-or-so tenure at the store, she had been passed over for a supervisory role due to her age.[7]  Ms. Roberts submitted an online inquiry to the Little Rock area EEOC office and, simultaneously, scheduled an appointment with the EEOC for January 7, 2019.[8]  Ultimately, on February 13, 2019, Ms. Roberts filed a Charge of Discrimination with the EEOC against PVH.[9]

This case is not about the age discrimination alleged in the February 2019 EEOC Charge.  Rather, it is about whether PVH retaliated against Ms. Roberts for making that Charge.  Whether or not the initial Charge had any merit, it is still a violation of the ADEA to retaliate against an employee for making a Charge.[10]  Often, retaliation cases turn on, or are at least informed by, the relative timing between the first filing of an EEOC Charge and the adverse employment action taken against the employee.[11]  Accordingly, the Court believes it important to walk through in some detail the timeline of the EEOC process and the timeline of Ms. Roberts's employment.  Let's take each in turn.

---

[6] *See id.* at 119.

[7] *See id.* at 56.

[8] *See id.* at 119.

[9] *See id.* at 53, 243.  There is some confusion regarding when the first EEOC Charge was filed and why there was a significant delay between Ms. Roberts's initial contact with the EEOC and the formal filing of the Charge.  *See id.* at 53–55, 117–118 ("EEOC is federal.  So nothing was processed until February.").  The best the Court can figure is that Plaintiff's testimony is referencing the federal shutdown from December 22, 2018, through January 25, 2019.  *See* CONG. BUDGET OFF., THE EFFECTS OF THE PARTIAL SHUTDOWN ENDING IN JANUARY 2019, 1 (2019).  The Court takes judicial notice of the shutdown.  *See* Fed. R. Evid. 201.

[10] *See Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 615 (8th Cir. 2003) (retaliating against an employee for filing an EEOC charge—a protected activity—is a violation of the ADEA).

[11] *See, e.g.*, *id.* at 616 (concluding that a time interval of more than two months was "too long to support an inference of causation"); *see also Lissick v. Andersen Corp.*, 996 F.3d 876, 886 (8th Cir. 2021) (rejecting a three-month interval between plaintiff's protected activity and termination); *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 987 (8th Cir. 2011) (concluding that a nine-month interval did not satisfy the causation element of a *prima facie* case); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (rejecting a two-month interval between plaintiff's EEOC complaint and termination); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (holding a two-week interval between plaintiff's complaint and termination was "sufficient, but barely so").

## I. The EEOC Process

As noted above, Ms. Roberts filed a formal age discrimination EEOC Charge against PVH on February 13, 2019.[12]  By that time, she had been promoted to the position of Temporary Floor Supervisor.[13]  But she was not satisfied with that outcome.  Ms. Roberts's EEOC Charge alleged that she had been denied earlier promotions and denied a permanent promotion because of her age:

> I was hired in the position of Sales Associate[] by the above-named employer . . . .
> Throughout my employment I have sought promotions to managerial/supervisory
> positions.  I have watched several new hires fill those jobs since I have been
> employed.  All of them are less than 30 years of age.  I was given a Temporary
> Part-time Supervisory position.  I have not been given a reason why I cannot fill a
> full-time managerial/supervisory position.  I believe I have been and continue to be
> denied a promotion because of my age (42) in violation of the Age Discrimination
> in Employment Act (ADEA).  I have a long history of retail managerial experience,
> considerably more than the less experienced comparatives.[14]

On April 2, 2019, PVH responded to Ms. Roberts's EEOC Charge by way of a "Position Statement."[15]  The Position Statement was drafted by ████████████████████████ [16]

████████████████████████████████████████████████ [17] ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[12] *See* Pl.'s Dep. (Doc. 36-1) at 53, 243.

[13] *See id.* at 48, 51.

[14] *See id.* at 243.

[15] *See* PVH Position Statement (Doc. 62); *see also* EEOC Right-to-Sue Letter (Doc. 44-1) at 1 (documenting that Ms. Roberts received PVH's Position Statement on April 30, 2019).  The Position Statement is a sealed document. Accordingly, the Court will be filing two versions of this Order on the record.  One version will be public.  That version will have redactions to maintain the confidentiality of the Position Statement.  The second version will be sealed.  That version will be a full unredacted Order.

[16] *See* PVH Position Statement (Doc. 62) at 8.

[17] *See id.* at 1.





On June 19, 2019, relying largely on this Position Statement, the EEOC declined to take further action on Ms. Roberts's Charge and issued her a right-to-sue letter.[19]  On September 23, 2019, Ms. Roberts filed a lawsuit based on the allegations in her first Charge.[20]  That lawsuit was assigned to this Court.[21]  PVH moved to dismiss the lawsuit, arguing that it was filed more than 90 days after the EEOC issued the right-to-sue letter.[22]  The Court never got a chance to rule on that Motion.  On December 10, 2019, Ms. Roberts filed a Notice of Voluntary Dismissal.[23]

---

[18] *See* PVH Position Statement (Doc. 62) at 4–5.

[19] *See* EEOC Right-to-Sue Letter (Doc. 44-1) at 1–2.

[20] *See Bridget Roberts v. PVH Corp.*, Case No. 4:19-cv-657-LPR (E.D. Ark.) (Doc. 1).

[21] *See id.* (Doc. 2) (noting reassignment to this Court effective November 15, 2019).

[22] *See id.* (Doc. 5).

[23] *See id.* (Doc. 8).

## II. Ms. Roberts's Employment

As noted above, Ms. Roberts was hired on October 23, 2017, as a part-time sales associate.[24]   About 15 months later, in late January 2019, Ms. Roberts was promoted to a Temporary Floor Supervisor position.[25]  A reasonable juror could infer from this that Ms. Roberts was successful during her 15-month tenure as a sales associate, and that her success warranted the promotion. ███████████████████████████████████████████[26]  Ms. Roberts signed a Temporary Assignment Acknowledgment, which stated that (1) she was "accepting a temporary position and temporary wage increase," and (2) her "position, wage, and standard hours code (if applicable) [would] revert back when [her] temporary assignment [was] over."[27]  Two days later, Mr. Osby orally assured Ms. Roberts that the temporary position would become permanent if and when a full-time floor supervisor role opened up.[28]

Fast forward to July of 2019—but don't forget that Ms. Roberts filed an EEOC Charge in February of that year.[29]  On July 15, 2019, Mr. Osby emailed his manager about issues with

---

[24] *See* Pl.'s Am. Statement of Disputed Material Facts (Doc. 45) at 1–2.

[25] *See* Pl.'s Dep. (Doc. 36-1) at 48–49.

[26] *See* PVH Position Statement (Doc. 62) at 4 █████████████████████████████████████████
████████

[27] *See* Pl.'s Dep. (Doc. 36-1) at 50, 52, 240.

[28] *See id.* at 49–51.  The record, taken in the light most favorable to Ms. Roberts, indicates that Mr. Osby told Ms. Roberts, on January 26, 2019, that the position would become permanent if a floor supervisor left.  *See id.* at 51 ("If someone left or someone got fired, [Mr. Osby] would move me into a full-time position."); *id.* at 110 ("I was told that if someone left or got fired, that he would push me in that position.  Someone got fired and he did not do that.").  PVH does not concede that Mr. Osby orally told Ms. Roberts that the promotion could morph into a full-time position.  PVH points to Ms. Roberts's signed Temporary Assignment Acknowledgment, her testimony that she understood the position was temporary, and her signed acknowledgement of the floor supervisor job description.  *See* Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 36) at 4.  In her deposition testimony, Ms. Roberts conceded that she signed the Temporary Assignment Acknowledgement, but explained that she was nevertheless told that the temporary promotion would become permanent.  *See* Pl.'s Dep. (Doc. 36-1) at 50.  For the purposes of summary judgment, the Court concludes that there is a genuine factual dispute as to whether her promotion was on a temporary basis or a permanent one.  As it must at this stage, the Court thus assumes the promotion was a permanent one.  In any event, the factual dispute is not material, because PVH concedes that the demotion was an adverse employment action regardless of whether the promotion had been temporary or permanent.  *See* Jan. 25, 2023 Hr'g Tr. at 5.

[29] *See* Pl.'s Dep. (Doc. 36-1) at 53, 243.

Ms. Roberts's job performance.[30]  On July 29, apparently at the request of his manager, Mr. Osby

forwarded that email to a PVH Human Resources representative.[31]  In the email, Mr. Osby outlined

numerous issues with Ms. Roberts's performance in her supervisory role:

> I hope this message finds you well.  I wanted to take a moment to bring to your
> concern some of the happenings here []at the store as it relates to Bridget Roberts.
> During my time with Bridget in the store, I have made it the utmost priority to focus
> on training and development with all of my managers.  We have utilized the
> Onboarding checklist and the Customer Service AOR description for Floor
> Supervisors to ensure she understands every responsibility as it relates to her role.
> We have utilized the AOR for both Customer Service in order to ensure priorities
> and development plan to simplify her role as a temporary superior and streamline
> her goals.  We have utilized weekly touch bases throughout the year to support
> individual coaching and addressing any concerns that she may have as it relates to
> her role.

> Originally, Bridget was responsible for the TCE AOR role throughout the building
> and she owned the women's department.  Months in, I saw no initiative around The
> TCE AOR specifically around marketing functions, meeting marketing deadlines,
> and ensuring coupon distribution was done in accordance to the Ql Marketing
> Overview.  It took several follow up attempts to get Bridget to complete score cards,
> and she never sent the follow up score card detailing our Marketing event back in
> April.  She also took no initiative to get involved with the Back to School Drive.
> Women's Sales also struggled during this time.  Frequently, it required my other
> Managers and even myself to support Bridget in her merchandising efforts.
> (I assisted in executing 2 overnight floor sets and worked almost exclusively in
> Women's to ensure the floor was set correct).  I spent time showing her how to
> merchandise personally, as indicated on the Onboarding checklist and addressed
> any merchandising concerns during our touch bases.

> In an effort to put my people first, at the end of May, I decided with her partnership
> and agreement to move her to the Kids Department and take over Operations
> instead.  We agreed that maybe women's and marketing was too much.  We both

---

[30] *See* E-mail from De'Shon Osby to Redacted Manager (July 15, 2019, 6:38 P.M.) (Doc. 44-2) at 1–3.  The email is redacted, but PVH's Human Resources Director, James Romano, testified that Mr. Osby "reached out to his manager and Human Resources for assistance" in July 2019.  *See* Decl. of James Romano (Doc. 36-2) at 1.  It only makes sense that the redacted name in the email is the name of Mr. Osby's manager.

[31] *See* E-mail from De'Shon Osby to Alexis Isler (July 29, 2019, 12:31 P.M.) (Doc. 44-2) at 1.  The identity of Mr. Osby's manager is redacted, but the email reads: "To my knowledge, [redacted] has reached out to you regarding the situation with Bridget Roberts." *Id.*  Between the email and testimony referenced in note 30, *supra*, and the email referenced in this instant footnote, the record strongly suggests that, after Mr. Osby emailed his manager concerning Ms. Roberts's purported performance issues, that manager contacted HR, and then told Mr. Osby to forward the email to HR.  This read of the record is strengthened by the content of a third email, which is discussed in note 33, *infra* (and the accompanying text).

agreed that with The Kids department being a smaller area and with prior knowledge around Operational procedures that fall under the audit, Bridget would be able to better manage these areas. She has reviewed audit guidelines with me and has been trained on additional auditing policies and procedures. We utilized the priorities and development tool on the intranet to support her new AOR and sales floor area of responsibility to ensure she really understood the expectation[s] and the measures of success. I also made sure she had a copy of the Operations AOR description for her review.

All of these efforts of investment have shown little return. I have had several Cash shortages that have resulted from negligence that were Bridget's Responsibility. The most recent incidents involving Bridget were on 7/8/2019 and 7/13/2019. On 7/08/2019, there was a cash shortage of 32.57 due to Bridget not conducting a post void for a cash transaction that should have been rang as a credit/debit transaction. This resulted in the customer walking out with free product. On 7/13/2019, there was a cash Shortage of $20 on register 3; Bridget and Abby both used this register. Prior to these discrepancies, there was also a cash shortage dating back to 2/24/2019 in the amount of 39.99; Bridget was the only associate to use this register on this day[.]

In addition to poor cash handling as indicated above, operationally, we've still had issues involving Bridget on multiple occasions of not inspecting trash properly before it is taken out, not conducting bag checks properly, Missing time on CCTV viewing, as well as not filing Incident reports for LP issues on the basis that she did not know how to do it. Prior to these incidences, I personally trained her and utilized the onboarding checklist to ensure she understood the proper policy around our LP practices. I also had Abby retrain Bridget on SIP, Security Incident Reports, and our policy and procedure around how to prosecute a confirmed theft in the building.

Finally, we have seen a dramatic decrease in productivity with Bridget since moving her to the Kid's Department and taking over operations. She has not done any of the best practices that have resulted in our success with the audit, resulting in [redacted] having to step in. This includes the SIP compliance checklist, media auditing, double checking the Deposit logs and Store Fund Verification log for signatures. Also, On June Floorset, Bridget did not complete Kids floorset despite assistance from Kirsten. July's floorset in Kids required assistance from [redacted].

Based on the information provided above, Bridget has shown she is not passionate for her AOR's nor is she able to consistently perform the job requirements as it relates to the Operations or TCE AOR roles. I feel it is necessary for us to consider finding another candidate for the supervisor position and consider putting Bridget in a more suitable role.

Please let me know your thoughts.[32]

The PVH Human Resources Representative, Alexis Isler, escalated Mr. Osby's concerns further.

Ms. Isler sent an email to PVH's Legal Department stating as follows:

> Sorry to throw this at you right as you're getting back!  [Redacted] called me on Thursday to give me a heads up that [Mr. Osby] would be reaching out to me with concerns about Bridget Roberts'[s] performance.  She is currently still in a temporary floor supervisor position.  [Mr. Osby] forwarded me this recap today.  I wanted to partner with you before I proceed.  Let me know when you would have some time to discuss this further.[33]

Ten days later—on August 8, 2019—someone from PVH (probably Mr. Osby) drafted a "Corrective Action."[34]  That Corrective Action makes clear that it is a First Warning.[35]  It details the purportedly below-expectations performance issues, and it provides the corrective actions taken.[36]  One of those corrective actions is central to this case:  "Due to the numerous and ongoing policy violations, [Ms. Roberts's] temporary assignment as a floor supervisor will end effective immediately.  She will return to her original position as a sales associate."[37]

The heart of the Corrective Action document is the description of the purportedly below-expectations performance issues.  The relevant portion reads:

> Through the first half of 2019, Bridget's performance has consistently been below the expectations set forth in the Floor Supervisor job description.  Bridget has been verbally coached on the expectations several times, yet she continues to not meet expectations, as demonstrated through the following examples:
>
> • Bridget missed the required CCTV audit for week 1 of February 2019.  On 2/27/19 the Store Manager reviewed the failed audit results related to the missed

---

[32] *Id.* at 1–3.

[33] E-mail from Alexis Isler to Redacted Recipient (July 29, 2019, 11:46 A.M.) (Doc. 44-2) at 1.  The Court is assuming the recipient of the email was someone in the Legal Department—because of the type of redaction made to the email.  However, it is not material whether the recipient of the email was in the Legal Department or in some other department.

[34] *See* Decl. of James Romano (Doc. 36-2) at 4–6.

[35] *See id.*

[36] *See id.*

[37] *Id.* at 6.

CCTV audits with Bridget. Following failed audits, all managers are required to review the Operations/LP audit action plan. She then missed completing a CCTV audit week 1 of May 2019. This is in violation of Policy 6-04 CCTV which states, "Each week, management associates are to review CCTV footage as per the following guidelines. Management associates who work 25 hours or more are to review CCTV footage for at least 30 minutes."

- On 3/12/19, 4/30/19, and 5/28/19, Bridget did not conduct trash inspections. This is in violation of Policy 6-13 Internal Theft which states, "A member of management must supervise and inspect trash removal. Management must inspect between each cardboard box by lifting each box and inspecting between cardboard bundles." On 3/25/19, another Operations/LP audit action plan was required due to the missed audit points for trash not being properly inspected. The Store Manager went over the policy wi[th] all managers at this time. However, Bridget then repeated the errors again.

- During week 4 of March, Bridget was assigned to submit the Tax Event Score Card. She did not meet the deadline for submission. In addition, 24 hours after the event is completed, a recap is required to be submitted. The Store Manager had to follow up multiple times to instruct Bridget to submit the recap. After another week went by and it was still not completed, the Store Manager ended up submitting it and Bridget never completed the task.

- Bridget did not complete coupon distribution in accordance with the Q1 Marketing Overview. The Q1 marketing overview was posted to the intranet at the beginning of Q1. The timeline for the overview stretches across a 3 month period, detailing coupon dates and deadlines. The expectations for marketing were discussed and clarified with Bridget during March Week 3. There were many coupon bounceback distribution periods that were missed. The Store Manager had to take over checking the marketing to ensure the correct coupons were being distributed. Bridget did not follow up to execute putting the new coupons out or purging the older coupons.

- Bridget has demonstrated a pattern of register discrepancies. This is in violation of Policy 4-27 Shortage and Overage which states, "Associates with repeated documented shortages or overages within a reasonable time frame, will be subject to disciplinary action up to and including termination."

  o On 2/24/19, there was a cash shortage of $39.99 on Bridget's register.

  o On 7/8/19, there was a cash shortage of $32.57. Bridget did not conduct a post void for a cash transaction that should have been rung as a credit/debit transaction. The customer received their product for free due to this error.

    o   On 7/13/19, there was a cash shortage of $20 on a register that Bridget was using.

- During the June floorset, Bridget did not complete the Kid's section floorset. Bridget was intentionally allotted an extra associate to assist with this process, yet it still was not completed.  Policy 1-11 Corrective Interviews states, "The following are some examples of unacceptable performance/behaviors that will result in disciplinary action, up to and including discharge:  Failure to meet company's standards of work performance."

- During the month of June, while Bridget was responsible for Operations, there were several aspects of the operations checklist that were not executed.

    o   On 7/15/19, it was discovered that Bridget had not audited the verifications funds log for missing signatures.  Another manager had to complete this because it was not done.  There had been missing signatures on the log dated back to 7/10.  This is in violation of Policy 4-30 Store Funds which states, "Management must count and verify the amount of the funds daily and record the amounts on the Store Fund Verifications Sheet."  A key part of Bridget's Operations role is to audit and ensure all paperwork is in compliance.

    o   The weekly Defeated EAS Log checklist had not been signed off on since Bridget took over Operations in June.  The Internal Audit checklist indicates item #10 "Weekly EAS compliance audits and Defeated Tag Log documented and current; and hand-held detachers secured in safe or at cash wrap."

    o   The SIP compliance checklist has been filled out incorrectly by Bridget each week in the month of July.  The Internal Audit checklist indicates item #5 "Store's 'Plan of Action' complete/current and 'Solutions' adequate and adhered to, and in Focus Stores Program Compliance Checklist fully completed each day."

- On 6/20/19 a theft incident occurred in the store when Bridget was the manager on duty.  Bridget did not complete a Shrink Incident Report for the theft.  She later stated to the Store Manager that she did not know how to do it.  However, the Store Manager had discussed this during her Loss Prevention training and she signed off on it on the checklist.  She was again retrained on how to complete this after the 6/20 theft incident.  On 7/13/19, she completed an SIR for a separate theft incident, but did not include the total amount that had been stolen.  This is an important piece of information to include.  This is in violation of Policy 6-12 Incident Report which states, "Complete a Safety and Security Incident Report, located on the Intranet, to document any of the following incidents: Shoplifting."  And Policy 6-24 Shoplifting which states, "Complete an Incident Report for each shoplifting occurrence."

Action Plan:

Bridget has demonstrated a pattern of failing to adhere to company policies and procedures, particularly surrounding loss prevention.   These policies and procedures are put into place to protect our company assets, which Bridget has failed to do.  This has a direct impact on the profitability of the business.

Bridget has also demonstrated a pattern of not taking initiative and not completing tasks on time.   On multiple occasions, other managers have had to step into complete tasks that she did not complete.[38]

On August 24, 2019, Mr. Osby and A'Dante Johnson, an assistant manager, met with Ms. Roberts to inform her that she would return to her original sales associate position.[39]  Mr. Osby read the Corrective Action to Ms. Roberts.[40]

Rather than signing the Corrective Action, Ms. Roberts wrote "refused to sign."[41]  She did this because she believed the contents of the Corrective Action were "not true."[42]  Contrary to the representation in the Corrective Action regarding repeated oral coaching, Ms. Roberts's testimony is that Mr. Osby never brought these issues up to her before.[43]  She did acknowledge, however, that Mr. Osby often mentioned issues to the employees collectively at staff meetings.[44]  Additionally, sometimes at those staff meetings, Mr. Osby would "point [her] out" with respect to performance issues.[45]  For example, Mr. Osby addressed her in a meeting for improperly setting a

---

[38] *Id.* at 4–5.

[39] *See* Pl.'s Dep. (Doc. 36-1) at 110.  The EEOC Charge was not mentioned at this meeting.  *See id.* at 75.  On a separate note, there is a lack of clarity between the parties on the spelling of A'Dante Johnson's name.  This is true of other names in this case as well.  The correct spelling of names is immaterial, so the Court has simply chosen one spelling per name.  If the Court's choice on any particular name is wrong, the Court apologizes to that person.

[40] *See id.* at 110.

[41] *See id.* at 73.

[42] *See id.* at 74 ("Because I didn't believe it, and it was not true"); *id.* at 110 ("I told them it wasn't correct.").

[43] *See id.* at 226 ("I made goal every—it was very few nights that I did not make goal, very few nights.  So the stuff that he brought to me that day, I was not even informed about it, so I'm shocked because I'm, like, okay, where this come from.").

[44] *See id.* at 158.

[45] *See* Pl.'s Dep. (Doc. 36-1) at 159.

floor and incorrectly filling out paperwork.[46]  Ms. Roberts more generally acknowledged that Mr. Osby would raise issues by individually addressing her in staff meetings and that he "just kept saying" to her, "You don't do what I tell you to do." [47]

Ms. Roberts recalled that, if something "was done incorrect[ly], [Mr. Osby] would come to you."[48]  Mr. Osby would approach Ms. Roberts with an issue and say, "if you don't change this then you won't be a supervisor in my building."[49]  However, Ms. Roberts makes clear that Mr. Osby "never came to [her] on . . . anything about the register missing any money" or "stuff like that."[50]  Additionally, Ms. Roberts makes clear that, prior to the August 2019 demotion meeting, (1) she "never got any" written reprimands "stating anything about" the issues in the Corrective Action, and (2) Mr. Osby "never discipline[d] [her] on anything like that."[51]  In sum, the record (read in the light most generous to Ms. Roberts) reveals that Mr. Osby told Ms. Roberts on several occasions that she was not performing well, but he did not formally reprimand her for (or specifically raise) all of the issues identified in the Corrective Action.[52]

But the record also specifically reveals that, before the end of June 2019, Ms. Roberts knew of at least some of the issues later identified in the August 2019 Corrective Action form.  We know

---

[46] *See id.* at 61.  Ms. Roberts alerted Mr. Osby that another floor supervisor, Abigayle VanCleave, had made a similar paperwork error.  *See id.* at 61 ("And then I would look at the paperwork where she didn't fill it out correct, and that was never brought to her attention.");  *id.* at 63 (identifying Ms. VanCleave as a floor supervisor).  When Ms. Roberts spoke with Ms. VanCleave about the paperwork, Ms. VanCleave said that Mr. Osby had not discussed the error with her.  *See id.* at 61.  Ms. Roberts thus concluded that Ms. VanCleave was not disciplined for the error.  *See id.*  But Ms. Roberts acknowledged that she did not view Ms. VanCleave's disciplinary files nor have firsthand knowledge of whether Ms. VanCleave was ever disciplined.  *See id.* at 61–62.

[47] *See id.* at 160.

[48] *See id.* at 63.

[49] *See id.* at 66.

[50] *See id.* at 158;  *see also id.* at 74 ("He had never brought a lot of this stuff to me.").

[51] *Id.* at 158;  *see also id.* at 110 ("I never got any discipline from that, any of those events.");  Aff. of Bridget Roberts (Doc. 44-7) at 1 ("I worked as floor supervisor until August without any disciplinary actions taken against me and without any notice from management that I was not meeting the expectations of my position.").

[52] *See* Pl.'s Dep. (Doc. 36-1) at 63 ("There [were] no writeups.");  *id.* at 111 ("I never received anything.").

this to be true because Ms. Roberts acknowledged her receipt of the EEOC's June 19, 2019 right-to-sue letter concerning her age discrimination EEOC Charge.[53]   In that letter, the EEOC relayed to Ms. Roberts a number of supervisory performance issues that PVH had identified:

> You were offered and accepted the position of temporary [Floor Supervisor] in January 2019.   [PVH] provided the following information regarding your assignment as [Floor Supervisor] including the following:
>
> - On February 24, 2019, you were responsible for closing out the registers at the end of business in accordance with the store closing policy.  You failed to account for two (2) merchandise credits when reconciling the consolidated tender report against the register balance report.  There was also a $40 shortage of cash related to your cash handling at the register, as confirmed by Closed Circuit Television ("CCTV") audit.  This resulted in the daily paperwork and deposit amount not accurately reflecting the day's financial business.
>
> - On February 26, 2019, you processed a transaction to completion in the register then "post voided" the transaction.  It was determined that you violated policy because no second employee signed off on the post void, and you failed to re-ring the sale within one (1) transaction of the post void.
>
> - On February 26, 2019, you exited the building without having your personal belongings checked by a member of management.  This is a violation of the Internal Theft Protection policy, which states that all employees' personal bags must be checked by a member of management when exiting the store and that it is the employee's responsibility to ensure their bag is checked prior to departure.
>
> - You failed to follow the CCTV review guidelines in violation of policy, which states management is expected to review at least 30 minutes of CCTV footage weekly.
>
> - You failed to complete at least two (2) cashier audits per shift, per day in violation of the Cash Pickup and Auditing Policy.[54]

---

[53] *See* EEOC Right-to-Sue Letter (Doc. 44-1) at 3;  Pl.'s Dep. (Doc. 36-1) at 248 ("I was issued a Notice of Rights to Sue on or about June 19, 2019 while I was working in the capacity of Temporary Supervisor.");  *id.* at 136 ("After the EEOC case stopped . . . [the EEOC] sent me a letter . . . .").

[54] *See* EEOC Right-to-Sue Letter (Doc. 44-1) at 2.

Some of these issues—specifically, the CCTV audits and cash-register discrepancies—overlap with the issues eventually identified in the Corrective Action form.[55]

Ms. Roberts's testimony is also that the performance issues identified in the Corrective Action are either completely untrue, true but falsely attributed to her, true but manufactured, or ridiculously overblown.[56] For example, Ms. Roberts believes that Mr. Osby wrongfully attributed to her a thirty-dollar cash register shortage created by a subordinate sales associate.[57] Still, Ms. Roberts acknowledged that she had cash register discrepancies on a few occasions—although she testified "a lot of times it was because it was other managers using that same register, and at the end of the night, I had to vouch for everyone."[58] For another example, Ms. Roberts also contests the Corrective Action's claim that she committed trash inspection violations.[59] When Mr. Osby confronted her about one of the trash violations, Ms. Roberts requested video footage of the violation.[60] Mr. Osby did not have footage of the violation, which Ms. Roberts treats as evidence that she did not commit the violation.[61]

For a final example, consider the Corrective Action's complaints about her poor performance supervising the Women's Department.[62] Ms. Roberts described being routinely

---

[55] See Decl. of James Romano (Doc. 36-2) at 4–5.

[56] See, e.g., Pl.'s Dep. (Doc. 36-1) at 74 ("Because I didn't believe it, and [the Corrective Action] was not true"); id. at 110 ("I told them [the Corrective Action] wasn't correct."); id. at 69 ("It was Bryce's register. I was supervising that night, but that was not my register."); id. at 71 ("I said can you show me the video [of the alleged trash violation].").

[57] See id. at 69.

[58] See id. at 199.

[59] See id. at 71–72.

[60] See id. Plaintiff seems to suggest that, because there are "cameras everywhere in there," the lack of footage of the violation is significant. See id. at 72.

[61] See Pl.'s Am. Statement of Disputed Material Facts (Doc. 45) at 4; Pl.'s Dep. (Doc. 36-1) at 71.

[62] See Decl. of James Romano (Doc. 36-2) at 4–5. There is some inconsistency surrounding when Ms. Roberts was assigned to the Women's Department. Mr. Osby stated that, when Ms. Roberts was first promoted to the temporary supervisory role, "she owned the women's department," but was moved to the Kids Department "at the end of May." See E-mail from De'Shon Osby to Redacted Manager (July 15, 2019, 6:38 P.M.) (Doc. 44-2) at 2. In her deposition

understaffed in the Women's Department.[63]   She observed that, in March 2019, Mr. Osby assigned

two or three sales associates to the daytime supervisors, but only assigned Ms. Roberts one sales

associate to assist her with evening shifts.[64]   She testified that this reflected Mr. Osby's general

attitude of making things harder for her after February of 2019.[65]   With respect to this general

attitude towards her, Ms. Roberts described a "change" in the way Mr. Osby treated her after she

brought her first EEOC Charge against PVH:[66]   "He threatened to always take my position.   He

gave me more work than he gave the other supervisors.   He gave me less staff at night.   He wouldn't

give me certain days I wanted off that he would give them, so he had started to treat me unfair."[67]

Overall, it appears Ms. Roberts's contention is that Mr. Osby was making up or otherwise

manufacturing the performance issues.   Indeed, Mr. Osby often praised her performance—at least

early on in her tenure as a supervisor.[68]   It is unclear whether Ms. Roberts is contending that

(1) Mr. Osby began the fabrication of performance issues in February 2019 and continued this

---

testimony, Ms. Roberts stated that her placement varied and that "this Monday could be women's.   Next Monday could be children.   It's just wherever he wanted to put you."   *See* Pl.'s Dep. (Doc. 36-1) at 196.   For purposes of summary judgment, the Court takes Ms. Roberts's side on this disputed fact.

[63] *See* Pl.'s Dep. (Doc. 36-1) at 215–16.

[64] *See id.* at 215.

[65] *See id.* at 72.   A coworker, Kason Cooley, submitted an affidavit opining that Mr. Osby "frequently" understaffed Ms. Roberts, making it "virtually impossible" for Ms. Roberts to complete floor sets and supervise shifts.   *See* Aff. of Kason Cooley (Doc. 44-8) at 1–2.   PVH argues that Mr. Cooley is not competent to assess Ms. Roberts's "performance or the circumstances of her demotion" because he never supervised Ms. Roberts.   *See* Def.'s Reply Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 46) at 7.   Ultimately, this fight is a red herring.   At summary judgment, the Court views the record in the light most favorable to Ms. Roberts anyway.   Mr. Cooley's "evidence" (even assuming it's competent evidence) is at most cumulative of evidence provided by Ms. Roberts.

[66] *See* Pl.'s Dep. (Doc. 36-1) at 58–59 ("But as soon as the case hit is when he starts to do his retaliation . . . ."); *id.* at 59 ("[O]nce it came out, I started noticing that De'Shon Osby started to change with me.").

[67] *Id.* at 60.

[68] It is Ms. Roberts's testimony that PVH promoted her based upon her successes as a sales associate and that she received ongoing positive feedback from Mr. Osby after the promotion.   *See, e.g., id.* at 75 ("I've got text messages showing [Mr. Osby said] oh, you did it, you blew it out, you made our numbers, I'm so proud of you."); *id.* at 77 ("I was the top seller for months . . . ."); *id.* at 226 ("I made goal every—it was very few nights that I did not make goal, very few nights . . . ."); *id.* at 227 ("[B]ut the text shows all the times that [Mr. Osby] thanked me for making goal and doing my job.").   For purposes of summary judgment, the Court accepts Ms. Roberts's testimony regarding Mr. Osby's praise of her as accurate.

16

campaign into August, or (2) sometime closer to July or August, he made up purported performance problems in February through June.[69]  But, whatever the alleged fabrication timeline might be, Ms. Roberts is clear that she believes Mr. Osby's actions (including the demotion) were in retaliation for the EEOC Charge she filed against PVH in February of 2019.[70]

And, in Ms. Roberts's view, the retaliation did not stop there.  After the demotion, Ms. Roberts worked far fewer hours.[71]  PVH attributes this reduction to Ms. Roberts's decision to reduce her availability.  But Ms. Roberts tells a different story.[72]  She testified that, after the demotion, Mr. Osby often "cut [her] shift," resulting in her only working "two or three hours" per day.[73]  Between the shift cuts and the lower pay of a sales associate, Ms. Roberts was "forced to work an additional job."[74]  This second job is what caused her "reduced availability."[75]  Ultimately, Ms. Roberts is trying to paint a picture of a sophisticated effort to make remaining at PVH as unpalatable and economically difficult for her as possible.[76]

---

[69] *See* Jan. 25, 2023 Hr'g Tr. at 38–41.

[70] *See* Pl.'s Dep. (Doc. 36-1) at 58 ("But as soon as the case hit is when he starts to do his retaliation, Mr. Osby.").

[71] *Compare* Tommy Hilfiger Weekly Schedule (Doc. 44-4) at 1–44 (recording hours from January 1, 2019, through October 28, 2019), *with id.* at 45–59 (recording significantly reduced hours between November 1, 2019, and January 31, 2020).

[72] *See* Aff. of Bridget Roberts (Doc. 44-7) at 4.

[73] *See* Pl.'s Dep. (Doc. 36-1) at 77.

[74] Indeed, Ms. Roberts filed for unemployment compensation after the demotion—for "[a]bout two and a half months"—because Mr. Osby "only gave [her] four hours a week."  *See* Aff. of Bridget Roberts (Doc. 44-7) at 4.

[75] *See id.* ("After [Mr.] Osby demoted me, he began to significantly cut my hours to levels much lower than the hours I worked as floor manager and lower than the hours I worked as a sales associate prior to the promotion.  As a result of the reduced hours, I was forced to work an additional job.  On October 24, 2019, I changed my availability to Saturdays and Sundays only to accommodate new employment.").  Moreover, on November 3, 2019, Ms. Roberts learned that Mr. Osby had scheduled her to work on Black Friday.  *See* Pl.'s Dep. (Doc. 36-1) at 144.  At that time, her availability was limited to Saturday and Sunday.  *See* Aff. of Bridget Roberts (Doc. 44-7) at 4.  When she complained about being scheduled for Friday work, Mr. Osby responded that, if a scheduled employee failed to show up, "I wouldn't want to be them."  *See* Pl.'s Dep. (Doc. 36-1) at 144.  Thereafter, Ms. Roberts reduced her availability further to only Sunday shifts.  *See id.* at 170.

[76] *See* Pl.'s Dep. (Doc. 36-1) at 60, 157–58.

### III.  Mr. Osby's Knowledge of the Initial EEOC Charge

For Ms. Roberts's retaliation theory to make any sense, Mr. Osby must have known about the EEOC Charge before Ms. Roberts's demotion in August 2019.  Ms. Roberts does not have firsthand knowledge that Mr. Osby knew about the February 2019 EEOC Charge before her demotion.[77]  Ms. Roberts never mentioned the Charge to him, nor to anyone else at PVH.[78]  And Mr. Osby never mentioned the Charge to her.[79]

It is true that Ms. Roberts testified that other supervisors said Mr. Osby did know about the EEOC Charge.[80]  But the competent testimony on this subject does not specify when Mr. Osby learned of the EEOC Charge.[81]  For example, we know that, "sometime" in 2021, Ms. Roberts heard from a co-worker named Kirsten McIntosh that a supervisor named Abigayle VanCleave knew about the EEOC Charge (or the subsequent litigation) and had talked with Ms. McIntosh about it.[82]  On this occasion, Ms. McIntosh relayed to Ms. Roberts that Mr. Osby was the one who told Ms. VanCleave about the EEOC Charge (or the subsequent litigation).[83]  But this was 2021,

---

[77] *See id.* at 60.

[78] *See id.* at 217.

[79] *See id.* at 59.

[80] *See id.* at 59–60.

[81] The best "timeline" testimony concerns a statement made by another supervisor named Maria Mwasi.  According to that testimony, while Ms. Roberts was still in her temporary supervisory role, Ms. Mwasi told Ms. Roberts that Mr. Osby had mentioned the EEOC Charge to Ms. Mwasi.  *See id.* at 115–16, 214–15.  The problem for Ms. Roberts is that it does not seem like Ms. Mwasi was speaking to Ms. Roberts "on a matter within the scope of" Ms. Mwasi's employment.  *See* Fed. R. Evid. 801(d) (defining statement of a party opponent).  Ms. Mwasi was not Ms. Roberts's supervisor and was not (even allegedly) making inquiries on behalf of Mr. Osby.  *See* Pl.'s Dep. (Doc. 36-1) at 216.  Ms. Mwasi's statements would very likely be hearsay as opposed to a statement of a party opponent.

[82] *See* Pl.'s Dep. (Doc. 36-1) at 116, 208, 216 ("She said, Hey, Bridget, did you—I heard that you suing De'Shon and—and the store, and I'm, like, okay, who said that.  She's, like, [Ms. VanCleave] told me that.  I said, Well, where did she get that from.  She said De'Shon.").  Almost all the relevant references in the testimony are references to a case, a lawsuit, or being sued.  Such testimony could be understood as focused on an actual lawsuit as opposed to Ms. Roberts's EEOC Charge.  But, at summary judgment, reading the record in the light most favorable to Ms. Roberts, a juror could reasonably infer these comments to be references by laypersons to the EEOC Charge.  It would be reasonable to think that a non-lawyer might speak about an EEOC Charge and a lawsuit using the same language.

[83] *See id.* at 208.

at least sixteen months after the demotion.  It is rank speculation to suggest Mr. Osby made the statement at issue before the demotion.

Ms. Roberts's direct testimony about Ms. VanCleave's statement doesn't help either. According to Ms. Roberts, she and Ms. VanCleave spoke about the EEOC Charge (or subsequent lawsuit) twice:  the "first time" was while "[Ms. VanCleave] was working for the company" and the second time was after Ms. VanCleave had left the company.[84]  On these occasions, Ms. VanCleave either stated or implied that Mr. Osby had told her about the EEOC Charge (or subsequent lawsuit).[85]  Unfortunately, the record does not reveal when Ms. VanCleave left the company; so we do not know whether the first conversation happened before or after Ms. Roberts's demotion.  Accordingly, there is nothing to tell us whether Mr. Osby's purported statement to Ms. VanCleave was made before the demotion.  And thus we can't reasonably infer Mr. Osby's knowledge of the EEOC Charge before the demotion—at least not from this testimony.

There is, however, evidence in this record from which a juror could reasonably infer Mr. Osby's knowledge of the initial EEOC Charge before Ms. Roberts's demotion.  Recall that PVH filed a Position Statement in response to the initial EEOC Charge.[86]  Recall further that the Position Statement was filed in April of 2019.[87] ███████████████████████████████████

███████████████████████████████████████████████████████████[88]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[84] *See id.* at 210.

[85] *See id.* ("[Ms. VanCleave] would kind of say something about a lawsuit . . . . When she called me on the phone, she asked specifically, Are you suing De'Shon, Are you suing the company, PVH.").

[86] *See* PVH Position Statement (Doc. 62).

[87] *See id.* at 1.

[88] *See id.* at 4–5.

████████████████████████████ [89]   Although not the only reasonable conclusion,
one reasonable inference from all this is that Mr. Osby was informed of the initial EEOC Charge
and was asked to provide information on Ms. Roberts for the Position Statement. [90]   When exactly
Mr. Osby first learned of the EEOC Charge is up for debate.  But, under this Osby-helped-with-
the-Position-Statement theory—the only theory of Mr. Osby's pre-demotion knowledge of the
EEOC Charge supported by the evidence—Mr. Osby's first knowledge of the Charge would've
had to have been sometime before April 2, 2019.

### IV. Procedural History

On December 24, 2019, Ms. Roberts filed a second EEOC Charge alleging that Mr. Osby
retaliated against her because of her February 2019 EEOC Charge:

> I filed a previous charge of discrimination (493-2019-00055) alleging Age
> Discrimination against the above-named employer on or about February 13, 2019.
> I was issued a Notice of Rights to Sue on or about June 19, 2019 while I was
> working in the capacity of Temporary Supervisor.  I was demoted to the position
> of Sales Associate on or about August 24, 2019.  Prior to my demotion, I had not
> been disciplined or reprimanded for any reason.  I was not given a reason why I
> was demoted.  I believe I was demoted in retaliation for filing a previous charge of
> discrimination in violation of the Age Discrimination in Employment Act (ADEA).
> I am aware that one person [was] hired after I was given the job of Temporary
> Supervisor, yet was promoted to a Permanent Supervisor position in September
> 2019. [91]

---

[89] *Compare id.* at 5,  *with* E-mail from De'Shon Osby to Redacted Manager (July 15, 2019, 6:38 P.M.) (Doc. 44-2) at
1–2,  *and* Decl. of James Romano (Doc. 36-2) at 4–5.

[90] 

[91] *See* Pl.'s Dep. (Doc. 36-1) at 248–50.

Once again, the EEOC declined to take the case and issued Ms. Roberts a right-to-sue letter.[92]

Ms. Roberts filed this suit on November 10, 2020.[93]   On October 21, 2022, PVH filed a Motion

for Summary Judgment.[94]   That Motion is fully briefed, has been argued, and is now ripe for

decision.

## DISCUSSION

A court shall grant summary judgment when there is no genuine dispute as to any material

fact and the moving party is entitled to judgment as a matter of law.[95]   The moving party has the

burden to show that (1) there is an absence of a genuine dispute of material fact on at least one

essential element of the nonmoving party's case and (2) the absence means that a reasonable juror

could not possibly find for the nonmoving party on that essential element of the nonmoving party's

case.[96]   Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or

otherwise, showing the existence of a genuine issue for trial," then summary judgment is not

appropriate.[97]   Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar

summary judgment. . . ."[98]   The dispute of fact must be both genuine and material to prevent

summary judgment.[99]   A genuine dispute of fact exists where a reasonable juror could decide the

particular question of fact for the nonmoving party.[100]   A material dispute of fact exists where the

---

[92] *See* Pl.'s Compl. (Doc. 1) at 3 ("On August 17, 2020, the EEOC mailed Plaintiff a notice of her right to sue."); Def.'s Br. in Supp. for Def.'s Mot. for Summ. J. (Doc. 36) at 6 ("The EEOC issued a dismissal and notice of right to sue on August 17, 2020.").

[93] Pl.'s Compl. (Doc. 1).

[94] Def.'s Mot. for Summ. J. (Doc. 35).

[95] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing Fed. R. Civ. P. 56(c)(2)).

[96] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[97] *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005) (citing *Celotex*, 477 U.S. at 317).

[98] *See Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[99] *See id.*

[100] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

juror's decision on the particular question of fact might affect the outcome of the suit under governing law . . . ."[101]

Ms. Roberts alleges that PVH retaliated against her because of the age discrimination EEOC Charge she lodged on February 13, 2019.[102]   Specifically, Ms. Roberts alleges that Mr. Osby retaliated against her by understaffing her, singling her out in staff meetings, falsifying and manufacturing performance issues, wrongly attributing omissions and errors to her, demoting her to her original sales associate position, cutting her hours, and requiring her to work holiday shifts.[103]

"The ADEA prohibits an employer from [retaliating] against an employee because the employee opposed a practice made unlawful by the ADEA."[104]   In cases like this one, plaintiffs either rely on direct evidence or use the *McDonnell Douglas* burden-shifting analysis to establish retaliatory motive.[105]   "Direct evidence is evidence showing a specific link between the alleged [retaliatory] animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that [the desire to retaliate] actually motivated the adverse employment action."[106] A paradigmatic example of such direct evidence would be an email (or even an oral statement) from Mr. Osby to a third party that admitted, "I demoted Ms. Roberts because she filed an EEOC Charge against PVH."   The record in our case—as in most retaliation cases these days—is devoid

---

[101] *See id.*

[102] *See* Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. (Doc. 44) at 5–6;  *see also* Pl. Dep. (Doc. 36-1) at 243–44.

[103] *See* Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. (Doc. 44) at 5–6.

[104] *Kneibert v. Thomson Newspapers, Mich. Inc*., 129 F.3d 444, 454 (8th Cir. 1997) (citing 29 U.S.C. § 623(d)).

[105] *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007) (applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

[106] *Aulick v. Skybridge Americas, Inc*., 860 F.3d 613, 620 (8th Cir. 2017) (internal quotations and citations omitted). Although *Aulick* is an ADEA discrimination case as opposed to an ADEA retaliation case, its definition of direct evidence is applicable in the retaliation context as well—obviously, with slight adjustment for the distinctions between discrimination claims and retaliation claims.

of direct evidence of retaliation.  Accordingly, Ms. Roberts must rely on the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, the initial burden rests on the plaintiff to establish a three-pronged *prima facie* case.  Ms. Roberts must establish that "she engaged in statutorily protected activity."[107]  Ms. Roberts must establish that she suffered an "adverse employment action."[108]  And Ms. Roberts must establish that "a causal connection exists between the two events."[109]  Because we are at the summary-judgment stage, the Court must determine whether, on the record before it, a reasonable juror could conclude that Ms. Roberts met her burden.  If Ms. Roberts makes out a *prima facie* case, PVH must point to "a non retaliatory reason for the adverse employment action."[110]  "If [PVH] can [point to] a legitimate, non-retaliatory reason for its actions, the burden returns to [Ms. Roberts] who is then obliged to present evidence that (1) creates a question of fact as to whether [PVH]'s reason was pretextual and (2) creates a reasonable inference that [PVH] acted in retaliation."[111]

PVH concedes that the filing of the February 13, 2019 age discrimination EEOC Charge was protected activity.[112]  PVH also concedes that the August 2019 demotion constitutes an adverse employment action.[113]  So that takes care of the first two prongs of the *prima facie* case.  All the action here concerns the third and final prong.  PVH argues that, on this record, a reasonable juror could not conclude that Ms. Roberts established the third prong of the *prima facie* case.  That

---

[107] *See Stewart*, 481 F.3d at 1043 (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)).

[108] *See id.*

[109] *See id.*

[110] *See id.*

[111] *Id.* (internal quotations and citations omitted).

[112] *See* Jan. 25, 2023 Hr'g Tr. at 5–6.

[113] *See id.* at 5 ("We do not dispute it was an adverse employment action that she was demoted.").

is, PVH says that Ms. Roberts did not produce any evidence of a causal connection between the filing of the age discrimination EEOC Charge and the demotion.[114]  PVH is right.  Ms. Roberts's *prima facie* case fails because she has no evidence of a causal nexus between her February 13, 2019 EEOC Charge and her August 24, 2019 demotion.  With some marginal time adjustments discussed below, this gap between alleged cause and alleged effect ends up being fatal to the retaliation claim, even at the summary-judgment stage.

The actor behind the demotion was Mr. Osby.  If Mr. Osby did not know about the EEOC Charge before he demoted Ms. Roberts, then Ms. Roberts could not possibly establish causation between the EEOC Charge and her demotion.[115]  If Mr. Osby did know about the EEOC Charge before he demoted Ms. Roberts, then the relevant gap to analyze for causation purposes is the time between when Mr. Osby learned of the EEOC Charge and when Ms. Roberts was demoted.  Either way, the most favorable read of the record for Ms. Roberts is a read on which Mr. Osby knew of the EEOC Charge before the demotion.  And, as explained *supra* at pages 18–20 (and the accompanying footnotes), there is only one piece of competent evidence to suggest that Mr. Osby knew of the EEOC Charge before Ms. Roberts's demotion.  That piece of evidence is PVH's Position Statement made in response to the initial EEOC Charge.  The content of this Statement suggested—or at least might suggest to a reasonable juror—that Mr. Osby participated in PVH's response to the EEOC Charge.

Because this is the only competent evidence to suggest Mr. Osby's knowledge of the EEOC Charge before Ms. Roberts's demotion, it is necessary to consider what this evidence reveals about

---

[114] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 36) at 7–11.

[115] To be fair, as a theoretical matter, even if Mr. Osby didn't know about the first EEOC Charge, there might be retaliation if PVH management knew about the Charge and directed Mr. Osby (1) to create a paper trail of performance issues with respect to Ms. Roberts, and (2) to demote her.  But there is absolutely no evidence to support such a conspiratorial theory in this case.  Understandably, Ms. Roberts does not press this theory.

when Mr. Osby could have first learned of the EEOC Charge.  On the record in front of the Court, a reasonable juror could infer that Mr. Osby learned of the EEOC Charge *after* February 24, 2019, and *before* March 31, 2019.  Recall that Ms. Roberts filed the EEOC Charge on February 13, 2019.[116]  Within ten days of an initial Charge of Discrimination filing, the EEOC sends a notice of the Charge to the employer.[117]  Accordingly, PVH likely received notification of Ms. Roberts's EEOC Charge by February 23, 2019—ten days after Ms. Roberts filed it.  But that doesn't pinpoint when Mr. Osby learned of the Charge.  It is not reasonable to infer that Mr. Osby learned about the Charge on the same day that PVH corporate received notification from the EEOC.  The only reasonable inference is that Mr. Osby learned about the Charge at some date after PVH corporate learned of the Charge.  So the reasonable inference here is that the earliest Mr. Osby could have known about the Charge was February 24, 2019.

But what about the latest date he could have learned of the Charge?  PVH's Position Statement to the EEOC was dated April 2, 2019.[118]  That was a Tuesday.  It would be unreasonable to think that PVH contacted Mr. Osby to investigate the EEOC Charge any later than March 31, 2019 (the Sunday before the Position Statement was submitted).  After all, the attorneys needed at least a few days to get information from Mr. Osby, include that information in the Position Statement, edit that Statement, and obtain approvals to file it.  On this record, then, if a reasonable jury was to find that Mr. Osby knew about the EEOC Charge before he demoted Ms. Roberts, that

---

[116] *See* Pl. Dep. (Doc. 36-1) at 243.

[117] *See* 29 C.F.R. § 1626.11 ("Upon receipt of a charge, the Commission shall promptly notify the [employer] that a charge has been filed."); U.S. EQUAL EMP. OPPORTUNITY COMM'N, *What You Can Expect After Your File a Charge*, https://www.eeoc.gov/what-you-can-expect-after-you-file-charge ("Within 10 days of the filing date of your charge, we will send a notice of the charge to the employer.") (last accessed Sept. 25, 2023); U.S. EQUAL EMP. OPPORTUNITY COMM'N, *Confidentiality*, https://www.eeoc.gov/confidentiality ("By law, we are required to notify the employer of the charge within 10 days of the filing date.") (last accessed Sept. 25, 2023); *cf E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 63 (1984) (noting that when an employee makes an employment discrimination charge in the Title VII context, the EEOC shall "serve a notice of the charge . . . on the employer . . . within ten days of the filing of the charge.").

[118] *See* PVH Position Statement (Doc. 62) at 1.

jury would also have to conclude that Mr. Osby gained this knowledge sometime between February 24, 2019, and March 31, 2019.  There is no evidence in the record to the contrary.  The upshot of all this is that the relevant gap between when Mr. Osby learned of the EEOC Charge and when he demoted Ms. Roberts would be either six months exactly or just shy of five months.  That's still a huge gap.

The Eighth Circuit makes clear that "a gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive," and the "causal nexus tends to evaporate" after the elapse of a months-long "lengthy delay."[119]  Indeed, a "time interval of more than two months is too long to support an inference of causation."[120]  Weeks, not months, is the touchstone here.  The Eighth Circuit has held that a two-week interval between the protected activity and an adverse employment action was "sufficient" to establish causation, "but barely so."[121]  In the instant case, the five-to-six-month time gap makes it unreasonable for a juror to infer causation, especially because there is no other evidence of causation.[122]

In an attempt to avoid this fatal timing problem, Ms. Roberts tries to move the goalposts. She focuses on the two-month interval between the EEOC's declination of her case in June 2019, and her demotion in August 2019, describing the temporal proximity of those events as

---

[119] *See Stewart*, 481 F.3d at 1044, 1046 (internal quotations and citations omitted) (rejecting a six-month interval as too far attenuated).

[120] *See Trammel*, 345 F.3d at 616 (citing *Kipp*, 280 F.3d at 897).

[121] *See Smith*, 302 F.3d at 833.

[122] In a lemons-to-lemonade maneuver, Ms. Roberts seems to argue that the "other evidence of causation" is the long list of purported performance issues that Mr. Osby catalogued between February 2019 and August 2019.  But that makes no sense. ████████████████████████████████████████████████████████████████████ But Ms. Roberts was not demoted for over four more months.  Ms. Roberts's argument boils down to saying that PVH and Mr. Osby waited the next four months simply to avoid the appearance of retaliation.  But that is rank speculation.  It is supported by no evidence whatsoever.  And no reasonable juror could reach that conclusion.

"[c]urious[]."[123]   Ms. Roberts essentially argues that Mr. Osby waited on the resolution of the EEOC investigation to demote her.[124]   But Ms. Roberts cannot use the date she received an EEOC right-to-sue letter as the starting date for purposes of the temporal-proximity analysis.   The Supreme Court has expressly rejected such an "utterly implausible" gambit.[125]

In sum, Ms. Roberts has failed to provide any evidence from which a reasonable juror could conclude that a causal connection exists between her filing the age discrimination EEOC Charge in February of 2019 and being demoted from her supervisory role in August of 2019.[126] Accordingly, Ms. Roberts does not make it past the *prima facie* part of the *McDonnell Douglas* test as it applies at summary judgment.   The Court need not go on to determine whether Ms. Roberts has provided evidence from which a reasonable juror could conclude that PVH's legitimate, non-retaliatory reasons for the demotion (and subsequently reduced hours) were actually pretext for retaliation.

---

[123] *See* Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. (Doc. 44) at 4.

[124] *See id.*

[125] *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (rejecting proposition that an EEOC right-to-sue letter issued three months before the adverse employment action was evidence that could establish the causation element of a retaliation claim).   In any event, even if Ms. Roberts could measure the causation interval from the date of the EEOC's declination of her case, her retaliation claim wouldn't survive.   Over two months elapsed between the June 19, 2019 EEOC right-to-sue letter and the August 24, 2019 demotion.   The Eighth Circuit has clearly held that a two-month gap between protected activity and an adverse employment action "so dilutes any inference of causation" as to preclude a finding of temporal connection.   *See Kipp*, 280 F.3d at 897.

[126] The same reasoning applies to the assertions that PVH reduced Ms. Roberts's hours (subsequent to the demotion) in retaliation for the February 2019 EEOC Charge.   And with respect to the other workplace hardships that Ms. Roberts alleges, none of those are the type of adverse employment action that is required by the second prong of the *prima facie* test.   "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Wagner v. Campbell*, 779 F.3d 761, 766–67 (8th Cir. 2015) (internal quotations and citations omitted) (rejecting an employer's reprimand of an employee as a materially adverse employment action necessary to satisfy a *prima facie* case of retaliation).

## CONCLUSION

For the reasons stated above, the Court GRANTS the Motion for Summary Judgment in its entirety.[127]  Judgment will be entered for Defendant PVH Corp.

IT IS SO ORDERED this 27th day of September 2023.


_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[127] Defendant's Motion in Limine to Exclude Plaintiff's Alleged Damages (Doc. 49) is MOOT given the Court's grant of summary judgment in Defendant's favor.